[Filed June 11, 1885.]

## THE CITY OF SALEM CO. *v.* THE SALEM FLOUR-ING MILLS CO.

CONSTRUCTION OF COVENANT. — A covenant in a deed provided "that the said S. F. M. Co. shall be entitled to have the Santiam water which is introduced to Salem by said W. W. M. Co., except the water right heretofore granted to the State of Oregon by contract, divided into two equal parts, and that one half of the same shall flow and be conducted by the race now in use to the premises herein granted to the party of the second part, and the other half thereof shall flow down in the natural channel of Mill Creek, or through such other channel as may be provided; said division of said Santiam water shall be made at or near the dam on the land claim of A. F. Waller and wife, where the race running to the oil mill is taken out of Mill Creek. . . . . And it is further covenanted by and between the parties hereto, their successors and assigns, that the said S. F. M. Co. shall pay one sixth of the expense, or do one sixth of the labor, and furnish one sixth of the material necessary to maintain in full use and repair the head-race and gates on or near the Santiam River, now owned

and used by W. W. M. Co. for introducing said Santiam water to Salem; *also maintain the dam on said Waller's claim.*" . . . . *Held,* that under said covenant, the dam on the Waller claim was to be maintained by the S. F. M. Co. at their own expense.

ID. — INJUNCTION—SUIT TO PARTITION WATER. — An injunction will not be granted against said S. F. M. Co. in favor of the W. W. M. Co., or its representatives, to prevent the construction of a dam by the former at the point indicated, but a suit may be maintained to compel an equal division of the water.

MARION COUNTY. Defendant appeals. Reversed and complaint dismissed without prejudice.

*Geo. H. Williams,* and *Shaw & Burnett,* for Appellant.

*McDougall & Bower,* and *Til. Ford,* for Respondent.

THAYER, J. — This is an appeal from a decree rendered in a suit to enjoin the appellant from the construction of a certain dam upon what is known as Mill Creek, in the city of Salem. The parties are both private corporations, organized under the laws of the State of Oregon for the purpose of operating mills and manufacturing flour, and doing a general milling business. The respondent alleged in its complaint that it owned and operated two large flouring mills run by water-power supplied through the channel of Mill Creek, running among other places through the city of Salem, until it reached a point near said mills where, through a flume, it supplied them with water by which they were operated; that respondent was entitled to one half the water that ran in Mill Creek from natural and artificial supply; that it had the right to use and enjoy one half the waters flowing in said creek, and to make sales of water thereon, and to erect dams upon the same, and to erect, build, and maintain a dam, at a point known as the " bend " of said creek, at Waller's claim, in said city of Salem, in order to give water to the appellant, whose race entered said creek immediately above the point named for said dam, and that said appellant was entitled to have flow through said race, and from Mill Creek, one half the natural flow therein, and what water had heretofore been turned therein from the Santiam River; that the respondent had the right to maintain and repair such dam, and so con-

struct and maintain the same as to cause a fair division of the
water aforesaid in two equal moieties between the two parties;
that for a period of over ten years a dam had been maintained
at said point at the bend of said Mill Creek, in order to give,
and was giving, the appellant one half of said water as afore-
said; that said appellant, on or about the 13th day of July,
1883, tore away said dam without any good cause, and against
the will or consent of the respondent, and against its remon-
strance built with heavy lumber, bolts, and planks another dam
at the same point, but higher than the former dam, and so con-
structed the same that the appellant thereby got, or would have
got, more than half the water flowing down Mill Creek, to wit,
about two thirds thereof, to the injury, etc.; that the respond-
ent, within the then last five days, demanded from the appellant
its removal, and after its refusal to remove the same tore out the
central portion of said dam, and commenced work to build
another and proper dam instead thereof, with a view of divid-
ing the water equally between said corporations, of which appel-
lant had notice; that the appellant obstructed the respondent
and its employees from proceeding with said work, and wrong-
fully took possession and control of the land adjoining such
dam, and the channel of the stream, and had commenced to erect
and build a dam of a permanent character, and strongly con-
structed, similar to the one already torn away, but of such a
construction that the appellant will get about two thirds of the
water coming down the channel of Mill Creek as aforesaid, to
which it was not entitled. And the respondent charged that,
unless the appellant was enjoined from further proceeding with
the building of such dam, a permanent, irreparable injury
would be done to the respondent, and it would not be able to
run its mills as they were wont, and as respondent had a right
to have them run, and that a great loss and damage would be
done to the respondent if the appellant was not so enjoined from
building and erecting such dam that it was engaged in so wrong-
fully erecting against the remonstrance of the respondent, and
in violation of its rights; that respondent had no plain, speedy,
and adequate remedy at law. Wherefore, respondent prayed

for a decree of said court restraining the appellant, and its servant or servants, from proceeding further with the erection of said dam, or interfering in any way with the respondent or its servants in the erection of a proper dam as above set forth, and costs and disbursements of the suit.

The appellant denied in its answer that it was only entitled to have flow through said race one half the natural flow of water in said creek, and what had been turned therein from the Santiam River; but averred that it was entitled to have flow into and through said race one half of the water as it had theretofore flowed in said creek, and also one half of the water in said creek as it might thereafter flow or be made to flow, including all water from the Santiam River, as well as the natural flow of the said creek; denied that the respondent had the right to maintain or repair said dam, or any dam, upon or across said creek, or to construct or maintain the same for any purpose, and denied that the dam theretofore existing at the said bend of Mill Creek gave, or was giving, to the appellant one half of the water theretofore flowing through said creek; denied tearing away the old dam without any good cause, or against the will or consent of the respondent, or that against its remonstrance it built another dam at the same point, or that it constructed any such dam so that it got or would have received more than one half of the water flowing down Mill Creek; and denied all injury and damage alleged in the complaint. Averred that the dam referred to in the complaint was an old, decayed, and leaky dam, and did not turn one half of the water flowing to it into the race, so as to give appellant the use of one half of the water flowing in said creek; that appellant proposed to join with respondent in the construction of a new dam in place of said old one, but that the latter refused, and that thereupon the appellant removed the old dam, and with the knowledge and consent of respondent, erected a new, good, and substantial dam in place thereof, which it claimed was constructed so as to divide the waters of said creek equally between the parties. Denied that the respondent demanded the removal of the new dam, and averred that it secretly, and in the night time, destroyed it, and

thereby prevented the waters from going to appellant's mill; denied that the respondent commenced the construction of another dam with the view of dividing said waters equally; denied that it obstructed respondent from proceeding with said work, and alleged that the respondent pretended to do some work near said dam for the purpose of harassing appellant; admitted that another substantial dam had been erected in place of the one torn away by respondent, but denied that by means of it appellant would get more than one half of the water; averred that the new dam was dividing the water equally between the parties; and denied that any injury would be done the respondent by means of the said dam, or that it would not be able to use its mills as they were wont, or as it had the right to have them run.     The appellant also, by way of counter-claim, alleged that on the 17th day of December, 1856, the legislative assembly of the Territory of Oregon incorporated the Willamette Woolen Manufacturing Company with power to bring water from the Santiam River to any place or places in or near Salem, through the channel or valley of Mill Creek, and with power to enter upon lands, and also said creek, and to do all things proper and suitable for the safe, direct, and economical conveyance of the water aforesaid.     Said corporation was to have exclusive right to the hydraulic powers and privileges created by water taken by it from the Santiam River, and the right to rent and sell the same, or any portion thereof, as it might deem expedient; that on the 11th day of April, 1870, said corporation executed a deed to the said Salem Flouring Mills Company for certain real estate, mill machinery, flumes, dwelling-houses, wharf, and water-power, with their appurtenances, as therein described.     Said deed contains the following covenants and agreements between the parties thereto:—

" And the said parties hereto mutually specially covenant and agree unto each other, their successors and assigns, and this covenant shall be construed to run with the title to said premises, as follows, to wit: That the said S. F. M. Co. shall be entitled to have the Santiam water, which is introduced to Salem by said W. W. M. Co., except the water right heretofore granted to the

State of Oregon by contract, divided into two equal parts, and that one half of the same shall flow, and be conducted by, the race now in use, to the premises herein granted to the party of the second part, and the other half thereof shall flow down the natural channel of Mill Creek, or through such other channel as may be provided; said division of said Santiam water shall be made at or near the dam on the land claim of A. F. Waller and wife, where the race running to the oil mill is taken out of Mill Creek; that said S. F. M. Co. shall be entitled to the use and flowage of the natural water of said Mill Creek to the same extent, and in the same manner, as the said W. W. M. Co. is now entitled, but at no time shall said party of the second part draw, or cause to flow to their works, more than one half of said natural flow of Mill Creek; and it is further covenanted by and between the parties hereto, their successors and assigns, that said S. F. M. Co. shall pay one sixth of the expense, or do one sixth of the labor, and furnish one sixth of the material, necessary to maintain in full use and repair the head-race and gates on or near the Santiam River, now owned and used by said W. W. M. Co. for introducing said Santiam water to Salem; also maintain the dam on said Waller claim; and said S. F. M. Co. further agree to pay one sixth of the expense, or do one sixth of the work, of clearing out the channel of Mill Creek, and enlarging the said head-race and gates, in case the owners of four of the six water powers of Salem shall in future decide to enlarge the flowage of water from said Santiam River to Salem, aforesaid.    And the said S. F. M. Co., their successors and assigns, shall pay one sixth of all damages caused, or to be paid, on account of maintaining, continuing or enlarging said head-race, works, or the flowage of said waters from the Santiam River to Salem; and it is further covenanted and agreed that said W. W. M. Co., its successors and assigns, shall keep up, or cause to be kept up, the necessary works and improvements to secure the usual flow of the Santiam water through their race and head-gates near the Santiam River to Salem, at all reasonable times, inevitable accidents excepted, and shall be liable to pay five sixths of the expense thereof, and the said S. F. M. Co. shall

be liable to ‚ pay the remaining one sixth of the expense thereof."

That appellant, by authority of the Willamette Woolen Manufacturing Company, proceeded to construct a new dam in place of the old one, after requesting respondent to join in the construction thereof; but before putting up the dam it requested the respondent to examine the plan of the proposed new dam, and its mode of construction, so as to be satisfied that it would fairly and equally divide the water between the parties, and thereupon the respondent sent its engineers, who, with the engineers appointed by the appellant, examined the plans and mode of building said dam, and agreed that it would be a dam when completed that would equally and fairly divide the water; that after removing the old dam, the appellant constructed on the site of it the new one, according to the plans and specifications agreed to by said engineers; that soon after, as before mentioned, the respondent destroyed it, and wantonly and maliciously destroyed the timbers and lumber of which it was constructed; that thereupon the appellant, by authority of the W. W. M. Co., erected the new one; that just before its completion the respondent, by false misrepresentations, obtained from the county judge of Marion County an injunction to restrain appellant from completing it, and thereupon the W. W. M. Co. completed it; that the object and purpose of the respondent in its proceedings were to prevent appellant from having the use of one half of the water; that it had machinery and mills of great value, wholly depending upon said water for their operative power, which, if the water were diverted, would be rendered of little or no value.

After alleging other grievances committed by the respondent, the appellant prayed an injunction against the respondent. A reply was filed on the part of the respondent to the new matter set forth in the answer, in which the respondent admitted the incorporation of the Willamette Woolen Manufacturing Company, as alleged in said answer, but denied that it executed a deed to appellant with covenants as set forth therein, except as especially set out in said reply, in a deed of conveyance of the 11th day of April, 1870, attached thereto and marked Exhibit

A, but denied specifically every other allegation of such new matter. The deed of which said Exhibit A is alleged to be a copy is the deed of April 11, 1870, referred to in appellant's answer, and contains the following additional covenant, relating to the grant of the water right in the water flowing in said creek, viz. : —

" And it is covenanted and agreed that the Salem Flouring Mills Company shall have the right to construct a waste gate through the levee, near the creek and block No. 36, or through the flume above the long bridge, so as to discharge all or any part of the water belonging to said Salem Flouring Mills Company into the bed of South Mill Creek, as the convenience of said party of the second part may require. And it is further understood and agreed that, in case any time hereafter said Willamette Woolen Manufacturing Company shall desire to introduce Santiam water to Salem for the purpose of watering the city, they shall have the privilege of diverting a sufficient amount of water from Mill Creek, above Salem, for such purpose, provided, always, that they introduce and cause to flow into the channel of said Mill Creek a sufficient amount of Santiam water, additional to what is used for milling purposes, as will make said mill powers at Salem as good as before the use of any part thereof, for watering said city. And in case said Salem Flouring Mills Company shall desire to take a sixth part or interest in said project of watering said city of Salem, they shall be entitled to do so, by paying one sixth part of the cost of said water-works, and paying one sixth of all expenses thereof at the time when the same are constructed."

These are the substantial issues in the case. There were many charges of bad faith and criminations and recriminations made, but they do not affect the main points. The pleadings were very extensive, though the issues tendered by them may, taken all together, be resolved into a simple question of controversy. Each of the parties had flouring mills ; each required the water that flowed down Mill Creek to operate them ; and each was confessedly entitled to one half the water thereof. The appellant, in order to secure a flow of the water to its mills, was compelled

to have a dam across the creek at a point below and near the mouth of its race.   Its right to a dam is conceded, and the point of its location had, long prior to the time of the commencement to build it, been selected.   The condition of the old dam as to decay and being out of repair is made an issue in the case, but certainly not a very important one, as the covenant in the said deed of April 11, 1870, expressly required the appellant to maintain the dam.   The appellant alone was interested in keeping it up, and if it built a new one every six months, the respondent was not affected at all.   The respondent was only entitled to one half the water, and without the dam it would get all of it. It was necessary, therefore, for the appellant, as well as obligatory upon it, to have a dam, and unless the building of it in some way interfered with the respondent's getting its half of the water, the latter had no cause of complaint.   The pleadings show that the appellant had authority to build the dam, subject only to the restriction that it should be built on the site on Waller's claim where the old dam was situated, on the said 11th day of April, 1870; that is, the covenant to maintain the dam, the old dam, implied the right and imposed the obligation upon the appellant to rebuild it, otherwise it could not be maintained. The maintenance of the dam would probably imply that, in the event of its having to be rebuilt, it should be built on the same spot.   This would be the strongest construction that could be claimed against the appellant.   The height of the dam, and the manner of constructing it, are, so far as appears from the pleadings, unrestricted.   The appellant is limited by the terms of the covenant as to the amount of water it is entitled to, that is, it is entitled "to have the Santiam water which is introduced to Salem by said W. W. M. Co., except the water right heretofore [theretofore] granted to the State of Oregon by contract, divided into two equal parts, and that one half of the same shall flow and be conducted by the race now [then] in use to the premises herein [therein] granted to the party of the second part, and the other half thereof shall flow down in the natural channel of Mill Creek, or through such other channels as may [might] be provided."   As

to the water naturally flowing in said creek, the appellant is, by said covenant, restricted as follows:—

"That said Salem Flouring Mills Company shall be entitled to the use and flowage of the natural water of said Mill Creek to the same extent and in the same manner as the said Willamette Woolen Manufacturing Company is now [then] entitled, but at no time shall said party of the second part draw or cause to flow to their works more than one half of said natural flow of Mill Creek."

It may be inferred from the pleadings, and the proofs show, that the respondent, since the execution of the said deed of April 11, 1870, has succeeded to the rights of the said Willamette Woolen Manufacturing Company in said water, and occupies the relation to the appellant of a purchaser of those rights from said woolen company under a purchase thereof subsequent to the execution of that deed. It may therefore be deduced from the pleadings alone that the respondent had the right to have one half of the water that flowed in Mill Creek, including the water from the Santiam River, and that which ran naturally in said creek, "flow down the natural channel of Mill Creek, or through such other channels as may be provided," subject to the water rights granted to the State, as referred to in said covenant, and that the appellant had the right to have the other half thereof turned into its race, and that it had the authority and was compelled, at its own expense, to maintain the dam on Waller's claim that existed on April 11, 1870, and that the maintenance of the dam implied the right to rebuild it whenever in its discretion the exigency demanded it. I am satisfied that a careful reading of the covenants in the said deed of April 11, 1870, will convince anyone that the conclusion above suggested is the only proper one that can be drawn therefrom, and I am not able to discover why the agents of the respondent need to have been exercised on account of the building of the dam in controversy by the appellant. The right to build a dam at the point where this dam was located, and to turn the water into the appellant's race, we may infer from the pleadings was secured from Waller, and if the right granted for that purpose did not authorize the

kind of dam the appellant constructed, then Waller, or his successors in interest, have a right to complain, but no one else has unless he can show that his vested rights are thereby injuriously affected; and I do not understand that the respondent claims or has attempted to show that it has succeeded to Waller's residuary interest in the claim upon which the dam was built.

It is, however, claimed by the respondent that the character of the dam the appellant was constructing when the suit was commenced would not enable the water to be divided equally; but that would be the misfortune of the appellant. Its covenant limited it to the use of one half of the water, and it would have no right to take more under any circumstances; if it did, it would render itself liable to damages, and to be enjoined from so doing. The respondent had no right to dictate the kind of dam the appellant should construct, but it had the right to object to its taking more than its half of the water. The appellant had bound itself by its covenant not to do so. "That the Salem Flouring Mills Co. shall be entitled to have the Santiam water," etc., "divided into two equal parts, and that one half of the same shall flow and be conducted by the race now in use to the premises herein granted to the party of the second part, and the other half thereof shall flow down in the natural channel of Mill Creek, or through such other channel as may be provided." "That said Salem Flouring Mills Co. shall be entitled to the use and flowage of the natural water of said Mill Creek," etc., "but at no time shall said party of the second part draw or cause to flow to their works more than one half of the said natural flow of Mill Creek," is the language of that instrument. When the appellant turns into its race more than one half of the water flowing in said creek, then the rights of the respondent are invaded, and if it should threaten to do that, and there was a well grounded apprehension that it would carry the threat into execution, a court of equity might interfere to prevent it. But the respondent has no right to complain about the dam, though it were built eighteen feet high, and diagonally across the stream, unless it could show that it would necessarily cause to flow into said race more than half of said water. The dam does not

divide the water. It creates a head so as to enable the appellant to turn into its race its portion of it. The race might not be of sufficient capacity to receive half the water; then how would the dam cause the respondent injury? It commenced its suit prematurely. The appellant had not violated its covenant not to take more than half the water, nor threatened to, and respondent's rights were not affected nor jeopardized. The most that can be said against the dam is that. the plan of it is such as will render it inconvenient to divide the water accurately, but the appellant will necessarily be the sufferer from that circumstance. If it takes more than half the water in any event, it will do so at its peril. Besides, there are no facts alleged in the complaint showing why the dam in question could not be employed so as to enable an equal division of the water to be made. The evidence shows that it has been constructed with weirs to gauge. the water that passes into Mill Creek, and that the water discharged into appellant's race passes through weirs provided for the like purpose.

I am unable to see how the suit can possibly be maintained upon the pleadings in the case. There has been a mass of testimony taken, tending to show the comparative amount of water the parties have been receiving since the dam complained of has been used, but it fails to prove that the structure is of such a character that an equal division of the water cannot be secured by means of it, and that is the vital issue the respondent must maintain to support his case by the record. Its complaint is against the construction of the dam, and the relief demanded is that the appellant be restrained from proceeding further with the erection of it, or from interfering with the respondent in the erection of a proper dam, with the view of dividing the water equally between the parties; but why the dam the respondent proposed to build will effect that end any better than the one in question, the complaint wholly fails to state. It is idle to allege that the dam the appellant was constructing would not divide the water equally, and that another one would, without pointing out the difference between them, or giving any reason why the one would be superior in excellence to the other; and yet that

is the condition of the respondent's complaint in the case. A court of equity has undoubted authority to regulate the use of water, the right to which belongs to two or more persons in common, so as to preserve the right of each owner. (Gould Water, § 540; Angell Water Courses, § 447 *a*, and cases referred to in the notes.) But this suit is not brought for that; the complaint was not framed in view of such remedy, nor does the relief demanded therein include it. A suit of that character would, under the circumstances, have been a very appropriate proceeding. The squabble between the officers of the two corporations, resulting in the pulling down and destroying of one dam and the preventing by force the erection of another, was unworthy of the gentlemen who occupied those positions. The door of the courts was open for the settling of the controversy, and they should have resorted to them in order to secure its adjustment. The respondent did begin a suit, but it entered the controversy in the forum where it had ended in the field. It was to complete by law what it had failed to effect by force; the preventing the appellant from building a dam, and the opportunity to build one itself. The Circuit Court strode over the case made by the pleadings, and attempted to adjudicate upon it the same as though it had been regularly and properly presented by the allegations of the parties. That course was a practical disposition of the affair; but I think the court should have directed the pleadings to have been amended, so as to have had the decree in accordance therewith.

It is a well-established principle of the law that a party must recover *secundum allegata et probata;* and aside from that, the decree of the court settled nothing. It found as a fact that the appellant was receiving twenty-five per cent more of the water than the respondent was, and, as a conclusion of law, that the respondent was entitled to receive twelve and one half per cent more water than flowed to it through the three open weirs which discharged into Mill Creek, and decreed that the respondent have authority to enlarge one of said weirs so as to discharge into said creek twelve and one half per cent more water. Relief of that character cannot properly be decreed in that way. The

decree should have been made so as to have required the appellant to desist from turning the amount of water it was using into its race; compelled it to lessen the size of its weirs so as to draw off no more water than was discharging into the creek. The decree should have been made so as to operate personally upon the appellant; then, if it did not obey it, its officers could have been attached for contempt of the court. Authorizing the respondent to enlarge the weirs discharging into Mill Creek would lead to endless controversy, whenever it exercised the authority granted by the decree. The appellant would have been very likely to have claimed that the enlargement was greater than had been permitted, and in turn have commenced a suit to restrain the respondent from taking so large an amount of water. Besides, it would not have been prudent to leave such a matter to an interested party to adjust, and is not in accordance with the usual course of judicial proceedings. It is too much in the nature of a reprisal. The authorities maintaining the jurisdiction of a court of equity to adjust the rights of parties having a common interest in water for hydraulic purposes are numerous, but I have been able to find but one which indicated with any degree of particularity the manner in which the adjustment should be made; that is the case of *Olmsted* v. *Loomis,* 9 N. Y. 423, which, in some respects, was similar to this, though the facts were more complicated. The court there held that the true and proper remedy was in the court of chancery, and that the mode by which the controversy could be determined with the least expense, and the greatest certainty of doing justice, was by a reference to one or more suitable referees, one of whom should be a capable engineer or mill-wright. The court said that "such a referee can learn more of the true merits of the case in a day, upon an actual view and examination of the mills and premises, than a jury or court can ever learn from hearing or reading the testimony of witnesses."

This course of proceeding by a referee and view has another advantage over an action at law. It enables the court to exercise its power of preventing future litigation. Powers may be given the referee to prescribe and establish, under the direction of the

court, some fixed mechanical gauge by which the quantity of water to which the plaintiffs are entitled may be kept within the main race, and not drawn off into the defendant's side race. This has frequently been done in cases of this description, and when parties cannot otherwise agree, and are disposed to be litigious, it is perhaps the only mode of preventing continual irritation and litigation between them. (*Olmsted* v. *Loomis*, N. Y. 430, 431.) If, in the present case, a course had been adopted similar to that suggested in *Olmsted* v. *Loomis*, it would have been much more satisfactory than a hearing upon depositions or oral testimony. The authority of the court to appoint a referee to ascertain any fact in a civil action, suit, or proceeding is ample. (Civ. Code, § 938, subd. 2.) By that mode a decree could have been rendered that would have judiciously adjusted the matter in controversy between the parties, and been final, so long as the condition of their affairs remained unaffected by forces beyond their control.

The proofs, however, in the case disclose a fact that embarrasses very much its settlement. It appears that two persons, Stratton and McCornack, are riparian owners of the land at the point where said dam is located, and for some considerable distance above and below it, and that they have, at a recent date, constructed a race connecting with Mill Creek at a point immediately above said dam, and by means of which they conduct a quantity of the water thereof through their premises, and discharge it into the creek at a point below the dam; that they have constructed head-gates at the mouth of their race, and from time to time turn into it from the creek a supply of water sufficient to run a small mill owned by them. The water discharged from their race runs down to the respondent's mills, and unless the amount thereof is estimated in the division of the water of said creek between the appellant and respondent, as provided in the said covenant, the latter will obtain that amount more than one half of it. It was claimed by the respondent upon the argument that the circumstance last referred to should not be considered, for the reason that Stratton and McCornack had no right as against either of the parties to divert the water

of the creek, and that the covenant in the said deed of April 11, 1870, specified that the division of the water of the creek should be made at the dam.  It may not appear from the proofs that Stratton and McCornack have any right to turn the water into their race, but it would not be safe or prudent to adjudge that they had no such right in a case to which they were not parties. The adjudication would not, of course, bind them, and·an attempted settlement of the rights of the parties to the suit, made upon the assumption that Stratton and McCornack were wrong-doers in their diversion of the water, would leave the matter in uncertainty and doubt.

In regard to the division of the water at the dam, the language of the covenant is as follows :  " Said division of said Santiam water shall be made at or near the dam of the land claim of A. F. Waller and wife, where the race running to the oil mill is taken out of said creek."   Whether this language would necessarily require the division to be made below the mouth of Stratton and McCornack's race is not, as I view it, important.   Each of the parties to the suit is entitled, as a matter of right, to one half of the Santiam water, and of the water naturally flowing in the creek.   The division is to secure to each of them that right, and if, by means of the race, a material part of the water is turned off above the point of division, but the respondent receives the benefit of it the same as it would if not diverted, it must, as a matter of equity, be considered in the admeasurement of the water each is to have.   The claim to such extra amount of water is unconscionable, and in violation of the maxim that " equality is equity " ; and besides, there is nothing shown in the case that would estop Stratton and McCornack, if made parties to the suit, from proving that they had obtained a right, either from the respondent or from the Willamette Woolen Manufacturing Company, prior to the acquisition by the respondent of its interest in the premises, to divert and use the water in the manner they have done.   It is impossible, in my opinion, to sustain the decree of the Circuit Court, or to grant the respondent any relief upon the pleadings as they are framed, consistently with equity and justice.   The ordinary course, in such a case, would

be to dismiss the complaint. But a large amount of testimony has been taken tending to show the amount of water the parties respectively are receiving. Many of the witnesses were professional experts in hydraulics, and a large expense has been incurred. The case ought to be definitely settled, but it cannot be done unless it is sent back to the Circuit Court, the complaint amended, and Stratton and McCornack made parties. A referee could then be appointed to ascertain and report a proper mode for dividing the water. I have not examined the testimony with a view of determining which party has been receiving the most of the water that flows in Mill Creek. I had an impression, when the case was argued, that the appellant was getting the larger portion of it, if the amount turned into Stratton and McCornack's race was not included, but all that evidence was in regard to water received by the parties after the commencement of the suit, and was irrelevant to the issue made by the pleadings. The threatened building of the dam was the "head and front of appellant's offending," and there was no cause for that. If the dam was so constructed that the weirs in the head-gate of appellant's race would discharge more water into the race than the same number and sized weirs in the dam would discharge into Mill Creek, the difference could easily be remedied. The Circuit Court seemed to have no difficulty upon that point. But the several amounts of water the parties receive can never be adjusted with mathematical precision. A fair, practical division of it is all that can be made. The more important determination is to establish the mode by which the division shall be made, in view of all the circumstances of the case.

A decree will be entered in accordance with the principles of this decision.

[NOTE. Upon a motion for rehearing of 'this case it was ordered that the complaint be dismissed without prejudice.—REP.]